CASE NUMBER 23-12746-A

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**ANTHONY J. CORIELL,**

Plaintiff/Appellant,

v.

**DOMINIC SNYDER** and **THE CITY OF DOUGLASVILLE,**

Defendants/Appellees.

---

ON DIRECT APPEAL FROM A FINAL ORDER
OF THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA

---

**BRIEF OF APPELLANT**

---

CRAIG T. JONES
Georgia Bar No. 399476
Craig T. Jones, P.C.
Post Office Box 129
Washington, Georgia 30673
(706) 678-2364 (office)
(678) 643-0062 (cell)
craigthomasjones@outlook.com

*Attorney for Appellant Anthony J. Coriell*

1

No. 23-12746-A
*Coriell v. Snyder*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(2), the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

1)    City of Douglasville
2)    Cohen, Hon. Mark H.
3)    Coriell, Anthony J.
4)    Gray, Harvey S.
5)    Gray, Rust, St. Amand, Moffett, and Brieske, LLP
6)    Georgia Interlocal Risk Management Agency (GIRMA)
7)    Jones, Craig T. and Craig T. Jones, P.C.
8)    Joseph, Alex
9)    Snyder, Dominic Snyder

Respectfully submitted this 25th day of August, 2023.

*/s/ Craig T. Jones*
CRAIG T. JONES
Georgia Bar No. 399476
Counsel for Appellant

2

# **TABLE OF CONTENTS**

Certificate of Interested Parties and Corporate Disclosure Statement………...........2

Table of Contents……………………………………………………….….………3

Table of Authorities……………………………….....................................4

Statement Regarding Oral Argument……………………………………………7

Statement of Jurisdiction……………………………………………………...…7

Statement of the Issues …………………………………………………….....8

Statement of the Case………………………………………………………….9

    Nature of Case……………………………………………………… 9
    Course of Proceedings and Dispositions in the Court Below………………...9
    Statement of the Facts…………………………………………………10
    Standard of Review..........................................……………21

Summary of Argument............ …………………………………………21

Argument and Citations of Authority ....... ………………………………….25

    A.    Reasonable jurors could find that it was objectively unreasonable under the Fourth Amendment to use a Taser against a passenger for merely fleeing the scene of a traffic stop……………………………25

    B.    Officer Snyder is not entitled to qualified immunity because it is clearly established law that it is unreasonable to tase a nonviolent suspect who is merely fleeing and likely to suffer serious injury…...34

    C.    Since the City admits the Taser was used in accordance with a policy that jurors could find defective, a jury could find the City is subject to *Monell* liability for federal civil rights violations……….………..43

    D.    Reasonable jurors could also find that Snyder committed a state law tort or constitutional violation..………………………………………46

    E.    Snyder is not entitled to official immunity under state law…………52

Conclusion……………………………………………………………...55

Certificate of Compliance………………………………………………....55

Certificate of Service…………………………………………………...56

# TABLE OF AUTHORITIES

<u>CASES</u>

*Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999)……………………...53

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)……………………………36-37

*Bradley v. Benton*, 10 F. 4th 1232 (11th Circ. 2021)…………………..30-32, 37-42

*Brosseau v. Haugen*, 543 U.S. 194 (2004)………………………………………..40

*City of Canton v. Harris*, 489 U.S. 378 (1989)…………………………………...43

*City of East Point v. Smith*, 258 Ga. 111, 365 S.E. 2d 432 (1998)………………46

*Cruet v. Emory University*, 85 F. Supp. 2d 1353 (N.D. Ga. 2000)……………….52

*Davis v. Standifer*, 275 Ga. App. 769 (2005)……………………………………..52

*Draper v. Reynolds*, 369 F. 3d 1270 (11th Cir. 2004)………………………...38, 48

*Dyksma v. Pierson*, No. 4:17-cv-00041-CDL (M.D. Ga. 7/16/18),

    *affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/19)…………………...49

*Eberhart v. State*, 307 Ga. 254, 835 SE2d 192 (2019)…………………....22, 25, 39

*Gardner v. Rogers*, 224 Ga. App. 165, 480 S.E.2d 217 (1996)…………………..53

*Georgia R. & Banking Co. v. Sewell*, 57 Ga. App. 674, 196 S.E. 140 (1938)……51

*Graham v. Connor*, 490 U.S. 386 (1989)………………………………………..25-26

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)………………………………………35

*Harris v. Coweta County*, 433 F.3d 807 (11th Cir. 2005)………………………..25

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)………………………21

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002)……………………………………35-37

*Illinois v. Caballes,* 543 U.S. 407 (2005)………………………………………12

*Jackson v. Sauls,* 206 F.3d 1156 (11th Cir. 2000)………………………………...31

*Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E. 2d 124 (1999)……..…………….....53-54

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)………………………………..26

*Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)…………………………26

*Lombardo v. City of St. Louis,* 594 U.S. __, No. 20–391

    (June 28, 2021) (*per curiam*)…………………………………………………28

*Merrow v. Hawkins*, 266 Ga. 390, 467 S.E. 2d 336 (1996)………………………..53

*Monell v. Department of Social Servs.,*

    436 U.S. 658 (1978)………………………………8, 20, 26-28, 35-36, 43-45

*Owen v. City of Independence*, 445 U.S. 622 (1980)…………………………27, 36

*Paul v. Davis*, 424 U.S. 693 (1976)……………………………………………49

*Pearson v. Callahan*, 555 U.S. 223 (2009)……………………………………..35

*Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010)…………..47-49, 54

*Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985)……….22, 27, 36, 41

*Rodriguez v. United States,* 575 U.S. 348 (2015)…………………………11-12, 30

*Saucier v. Katz*, 533 U.S. 194 (2001)…………………………………………..35

*Scott v. Harris*, 550 U.S. 327 (2007)…………………………………….....26

*Taylor v. Riojas*, 141 S. Ct. 52 (2020)………………………………………..36

*Tennessee v. Garner*, 471 U.S. 1 (1985)……………………………22, 25, 40-41

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)…………………………..26, 37

*Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT)

    (M.D. Ga. 11/18/21)………………………………..……29, 32, 36-39, 45

*Walker v. Oglethorpe Power Corp.*,

    341 Ga. App. 647, 802 S.E.2d 643 (2017)……………………2………..51

*Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 744 S.E.2d 686 (2013) ………52

*Youngblood v. Williams*, No. 2:16-CV-118, 2017 WL 4819392

    (S.D. Ga. Oct 25, 2017)……………………………………….. …….42

## FEDERAL STATUTES AND CONSTITUTIONAL PROVISIONS

The Fourth Amendment………………………………………….......*passim*

28 U.S.C. §1291……………………………………………………………8

28 U.S.C. §1331………………………………………………………..7

28 U.S.C. §1367…………………………………………………………7

42 U.S.C. §1983……………………………………...…9, 43, 47, 48, 50, 51

GEORGIA STATUTES AND CONSTITUTIONAL PROVISIONS

GA. CONST. Art. 1, §1, ¶13.…………………………………………..…47

GA. CONST. Art. 1, §1, ¶17………………………………………47, 50

O.C.G.A §9-2-3……………………………………………………49, 52

O.C.G.A. §16-3-21…………………………………………………46-48

O.C.G.A. §51-1-1…………………………………………………47, 49, 51

O.C.G.A. §51-1-6…………………………………………………..50-52

O.C.G.A. §51-1-7………………………………………………………51

O.C.G.A. §51-1-13…………………………………………………..46

O.C.G.A. §51-1-14…………………………………………………..46

OTHER SOURCES

Adams & Adams, Ga. Law of Torts (1998 ed.), §1.2(b)…………………………..51

U.S. Department of Justice and Police Executive Research Forum,
     *Electronic Control Weapon Guidelines* (March 2011)……………………..28

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument because this is an opportunity for the Court to clarify the law – if not already clear – on when police officer may use a Taser to apprehend an violent suspect who is fleeing but not combative, particularly under circumstances where it is foreseeable to a reasonable officer that use of the Taser will cause serious bodily injury. While the trial court opinion is thorough and well-reasoned overall, there are a couple of fine points on which the court erred by taking an overly narrow view of precedent and improperly viewing certain facts in favor of the movant rather than the nonmoving party on summary judgment. Oral argument will aid the decisional process by enabling counsel and the Court to engage in direct dialogue to flesh out those fine points and clarify the legal boundary between mere flight and physical resistance. Appellant respectfully submits that a clear line is already drawn by case law, and the question of which side of the line this case falls upon is a question of fact for the jury.

## STATEMENT OF JURISDICTION

**A.    Basis for District Court's Subject Matter Jurisdiction.**

The District Court had subject matter jurisdiction over the instant case pursuant to 28 U.S.C. §§1331 and 1367.

**B.    Basis for Appellate Court's Subject Matter Jurisdiction.**

This is a direct appeal from a final judgment of the District Court, for which

this Court has subject matter jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.    Whether reasonable jurors could find that it was objectively unreasonable under the Fourth Amendment to use a Taser against a passenger for merely fleeing the scene of a traffic stop.

2.    Whether it is clearly established law that it is unreasonable for a police officer to use a Taser against a nonviolent suspect who is merely fleeing and likely to fall and suffer serious injury if tased.

3.    Whether an admission by a city that its police officer used a Taser in in accordance with a city policy that jurors could find caused a plaintiff's constitutional rights to be violated would authorize the imposition of *Monell* liability against the city for federal civil rights violations.

4.    Whether reasonable jurors could find a state constitutional violation or tort under the facts of this case.

5.    Whether the Defendant officer is entitled to state law official immunity under the facts of this case.

## STATEMENT OF THE CASE

### Nature of Case

This is a direct appeal from a grant of summary judgment in a federal civil rights action against a police officer for the use of excessive force in violation of the Fourth Amendment, which also asserts a municipal liability claim against the officer's employer under 42 U.S.C. §1983 as well as pendent state law claims against the officer individually.

### Course of Proceedings and Disposition in the Court Below

On July 16, 2021, Plaintiff Alexander Coriell filed a complaint for damages in the Northern District of Georgia against the City of Douglasville and Officer Dominic Snyder alleging the use of excessive force by Snyder and the existence of a custom, policy or practice of allowing the improper use of Tasers by the City's police department.  Said Defendants filed a timely answer on September 15, 2021.  (Doc. 1, 8).  At the conclusion of discovery, Defendants filed a motion for summary judgment on November 30, 2022, to which Plaintiff filed a timely response on December 19, 2022.  (Doc. 45, 47).  On August 2, 2023, the trial court entered an order granting Defendants' motion for summary judgment and a clerk's judgment terminating the case.  (Doc. 57, 58).  Plaintiff filed a notice of appeal to this Court on August 14, 2023.  (Doc. 60).

**Statement of the Facts**

On August 24, 2019, Anthony Coriell, Jr. was a day laborer riding to a job site when the driver who hired him was stopped by Douglasville police officer Dominic Snyder for not having a license tag on his car. What happened after that was captured on police bodycam video, and the underlying facts of the incident are largely undisputed. However, those facts which *are* disputed are clearly material to the question of whether a jury could conclude that excessive force was used against Mr. Coriell in violation of either the Fourth Amendment or Georgia law.

It is undisputed that Mr. Coriell was on probation and was afraid he might be arrested for a probation violation, and it is undisputed that he gave a fake name to the officer when asked. It is also undisputed that when Officer Snyder told him to get out of the car, he complied with that instruction but then ran on foot from the scene. While he was running, Officer Snyder fired his Taser at Coriell from behind and caused him to fall face first on pavement, resulting in skull fractures and a brain injury.

However, the following factual disputes were glossed over by the trial court and *do* pose genuine issues of material fact that must be resolved by a jury:

1.    **There were no "furtive movements."** Defendants claim that Mr. Coriell and another passenger, also a day laborer, were making "furtive movements" inside the car which aroused Officer Snyder's suspicion. But there is

no evidence of that on the police video of the traffic stop, which clearly shows the two men sitting calmly and answering the officer's questions.  (Doc. 46, 47-4 at 3).  At one point on the video, Snyder can be heard radioing a canine officer and saying that the other passenger was being "standoffish," an apparent pretext to having the dog come sniff for drugs or other evidence of criminal activity when there was no probable cause for such a search or even reasonable articulable decision that the passengers had committed any crime.  *Id.*  In any event, Snyder made no contemporaneous mention of alleged "furtive movements" on video, *id.*, or in his incident report (Doc. 48, Ex. 1).  In fact, the first time that accusation is made anywhere in the record is not until Snyder's deposition two years later (Doc. 48 at 11), after which it is seized upon by Defendants' expert as a hindsight rationalization to prolong a stop whose sole legitimate purpose (to investigate an apparent tag violation) had already been accomplished. *See Rodriguez v. United States,* 575 U.S. 348 (2015) (Fourth Amendment is violated when permissible stop is unreasonably prolonged).

2. **The traffic stop for the tag violation was improperly prolonged beyond its lawful duration.**  The parties hotly dispute whether it was lawful for Officer Snyder to interrogate the passengers and compel them to produce identification when they were not driving the car.  Had that not occurred, Coriell would never have given a fake name and birthdate to hide the fact that he was on

probation after the purpose for the traffic stop had been accomplished. It can be inferred from the video that Snyder was satisfied by the driver's explanation that he had just bought the car and was still within the grace period to get a tag, and Snyder's decision to then turn his attention to the passengers had no relevance to the purpose for the stop in the absence of independent probable cause on their part. (Doc. 30 at 13-19, 22; Doc. 34; Doc. 47-4 at 2-5). *See Rodriguez*, 575 U.S. at 350–55 (citing *Illinois v. Caballes,* 543 U.S. 407 (2005)) ("A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.")

While Plaintiff and his expert do contend that the stop was unconstitutionally prolonged by Snyder's decision to request a canine officer, Plaintiff did not plead a Fourth Amendment violation on any grounds other than the excessive force claim because there was ultimately probable cause for Coriell to be arrested anyway, which counsel believed would cut off any recovery for the prolonged stop itself under Eleventh Circuit precedent. However, Snyder's overreach in prolonging the stop is still part of the totality of the circumstances that the jury may consider in assessing the reasonableness of Snyder's conduct, which led to a further Fourth Amendment violation when he used excessive force against a passenger running from a traffic stop that was essentially over. (Doc. 30 at 22;

12

Doc. 34).

**3.**    **There was no "assault" on Snyder by Coriell.**    The video shows

that after Snyder told Coriell to get out of the car, he simply bolted and ran.  (Doc.

46).   Reasonable jurors viewing the video can infer that any incidental contact

between the two occurred when Coriell was pushing himself away from Snyder's

grasp, not acting aggressively toward him.  (Doc. 30 at 22; Doc. 34; Doc. 46).

Snyder was nearly twice Coriell's weight at "six foot three [and] 300 pounds," and

Snyder's assertion in his deposition (not evident on video or mentioned anywhere

in his incident report or warrant applications) that Coriell "shoved me out of the

way and ran from a lawful traffic stop" is a laughable embellishment that a jury is

unlikely to believe, yet the trial court credited it as an undisputed fact that is not

clear one way or the other from the video.   (Doc. 48 at 41-42; Doc. 46; Doc. 30 at

22; Doc. 34; 45-9 at 4).

The video screenshot in Defendants' statement of material facts (Doc. 45-13

at 23) that is strategically paused to allegedly show Coriell raising his hand to push

Snyder is yet another hindsight embellishment.  That still frame is more plausibly

interpreted – in the context of the video as a whole – to show Snyder extending his

hand so he can rest it on the window for balance when he hoists himself from the

back seat after being told to exit the car.  If Coriell had in fact raised his hand to

Snyder, Snyder assuredly would have taken out a warrant against him for assault,

and if Coriell had in fact shoved Snyder as he claims, then Snyder would probably have charged him with battery.[1]    Instead, Snyder swore out a warrant for obstruction which merely accused Coriell of fleeing and refusing to obey a command to stop, which is exactly what happened when the evidence is properly viewed in the light most favorable to Plaintiff.  (Doc. 45-9 at 4).

**4.**    **Coriell was merely running when he was tased in a precarious position.**  Defendants allege that Coriell was tased while he was running on a grassy surface, and that he was "still" in the grass when the taser probes struck him, "at which time he continued forward onto an asphalt parking lot and collapsed."  (Doc. 45-1 at 10).  That is a mischaracterization of the evidence, and certainly not that version of the facts which is most favorable to Plaintiff as the nonmoving party on summary judgment – not even based on Defendants' own presentation of the evidence, let alone the testimony of Plaintiff which directly

---

[1] This is a reasonable inference in view of Snyder's meticulousness in applying for multiple arrest warrants to maximize the chances of a conviction. Rather than being satisfied with a felony drug possession charge which alone would result in a three-year sentence, Snyder – perhaps conscious of his own legal exposure after realizing the seriousness of Coriell's injuries – also decided to pile on two additional misdemeanor charges (giving false information to police and possession of the paraphernalia containing the felonious drug residue).  If there was any evidence of assault or battery, there is little doubt Snyder would have sought warrants for that as well.  And if there were any facts suggesting the obstruction offense rose to the level of a felony, he would have included them in his sworn statement of facts supporting the warrant because they would ensure a probable cause finding for either a felony or misdemeanor charge.  His unwillingness to swear to such "facts" is strong circumstantial evidence that they did not exist.

controverts Defendants' story.

The video shows that Coriell was immediately incapacitated by the Taser and unable to continue running, at which time he dropped to the pavement and landed on his face. (Doc. 46). It was foreseeable this would happen because Coriell was running toward the edge of the grass and about to step onto the pavement when Snyder aimed his Taser and pulled the trigger. Defendants concede that "it is clear from the video that Coriell's *momentum* carried him to the beginning of the paved parking lot of Ruby Tuesdays where he came to rest. (Doc. 45-1 at 10) (emphasis added). The admission that Coriell fell forward to the pavement due to the "momentum" from his previous motion – rather than any voluntary movement after being immobilized the Taser – is consistent with the fact that he as tased in a precarious position where he would foreseeably fall and suffer serious injury.

In any event, Plaintiff's testimony standing alone creates a genuine issue of material fact on that point:

> Q. …So in this video that is Officer Snyder and he is raising his hand with his taser. Do you agree with that?
> A. Yes.
> Q. All right. And what are you actively running on? Where are you located?
> A. I believe that, that's Highway -- I don't know what highway it was. We'd just got off Interstate 20 so [--]
> Q. That's not what I'm asking. It's a great answer, but … what I'm asking is are you on pavement or are you on grass?

A.    I was on grass.[2]

Q.    Okay.

MR. JONES: And [I] just object to the form … as to what point in time you're talking about. Are you talking about when he's raising his arm in the air in this picture or when he actually fired the taser?

A.    (Resuming) From what it looks like he had --

Q.    I guess my question's in this screen, this on moment in time … where the taser's visible … and you are running, are you on grass?

A.    Yes. **For a majority of me running, I was on grass. I didn't get tased until I hit concrete.**

Q.    Uh-huh.

A.    When -- I think I placed my foot on concrete maybe two times and that was it. Or asphalt.

Q.    So what happened after the officer deployed the taser?

A.    The only thing I remember is locking up. I didn't hear stop. I didn't hear I'm fixing to shoot. I didn't hear nothing. I just felt a jolt, and then it was -- I don't remember nothing until pretty much being in handcuffs and **pleading for him to get me off of the hot, hot ground.**

---

[2] The trial court misinterprets this testimony as an inconsistency in Coriell's story, but closer examination reveals that the court's characterization is taken out of context.  (Doc. 57 at 28, fn. 10).  When Coriell says that he "was on grass," he is being asked where the video shows that he was standing at the point where Officer Snyder is "raising his hand with his Taser."  (Doc. 44 at 44-45). That is not inconsistent with his subsequent statement that he "didn't get tased until I hit concrete," since the point in time at which a Taser is "raised," aimed, or even discharged is not the same as the point at which the Taser darts strike a moving target running in the opposite direction.  It should also be noted that Plaintiff's counsel objected to the form of that question as being unclear, at which time defense counsel rephrased the question to refer to the point depicted on "this screen, this on[e] moment in time … where the Taser's *visible*" – after which Coriell makes clear that he was on grass at that point on the video, but he was not actually tased until after he had stepped onto the pavement and had already "placed my foot on concrete maybe two times."  (Doc. 44 at 45).

(Doc. 44 at 44-46) (emphasis added). The "hot, hot ground" refers to the August heat of the Georgia pavement where he was dropped by the Taser and unable to move without assistance. Coriell goes on to testify that, after he regained consciousness and was aware of what had happened,

> I asked him why he didn't tase me in the grass, that he had a sufficient amount of time to tase me in the grass. I -- I immediately knew like, hey, man, like why ain't -- that's the first thing I recall saying actually.

(Doc. 44 at 47). There is clearly a factual dispute about whether he was tased in a precarious position where he would inevitably be injured, when there was no reason to believe he posed a threat.

**5.** **His injuries were not "*de minimis*."** Defendants were truly stretching logic when they argued in the trial court that they were entitled to summary judgment because Coriell's injuries – which required treatment at two different hospitals – were indisputably *de minimis* as a matter of law. While the facts speak for themselves, the trial court was apparently influenced by that mischaracterization since the summary judgment order minimizes the injuries by describing them as "facial scars, dizziness, headaches, and a crooked nose." (Doc. 57 at 7). In fact – as a result of landing face-first on the pavement – Coriell not only suffered facial lacerations, but fractures of facial bones and the skull, along with a subdural hematoma to his brain. (Doc. 47-1). The brain injury is consistent with not only the skull fracture but the testimony that he lost consciousness. (Doc.

17

44 at 46-47). Nowhere in the trial court do the words "skull fracture," "brain injury," or any variation of those terms appear, despite the information contained in Plaintiff's summary judgment brief. (Doc. 47 at 11-12; Doc. 47-1).

Those injuries are not only significant by definition – and clearly more than the mere bumps and bruises incidental to the minimal force used to effect a routine arrest – but also under the very case law cited backing Defendants' argument that minor cuts and abrasions "**but no broken bones** suggest *de minimis* injury," since the record shows Coriell *did* have broken bones. (*Compare* Doc. 47-1 and Doc. 45-1 at 19) (emphasis added).

Defendants' sweeping statement that Mr. Coriell had "no permanent injury" (Doc. 45-1 at 19) is unsupported by any medical evidence in the record, which will be further developed for trial by the testimony of one or more treating physicians. In any event, permanency (though not required to show that an injury is more than *de minimis*) can be inferred from Coriell's testimony that he continues to have facial scars, a "crooked nose," dizziness, and headaches (exacerbating a pre-existing history of migraines) that he attributes to the incident nearly three years later. (Doc. 44 at 33-34**).**

**6.     Coriell only pled guilty to the nonviolent level of obstruction that he was charged with.** After the incident, Officer Snyder applied for a total of four arrest warrants charging Coriell with the following offenses:

(a) possession of a glass pipe and steel wool used for ingesting cocaine in violation of "16-13-2-32.2(M)," which presumably is a cite to the O.C.G.A. section with the "M" standing for "misdemeanor" (Doc. 45-9 at 2);

(b)  possession of drug residue in the pipe that appeared to be cocaine in violation of "16-13-30(A)(F)," with the "F" presumably denoting "felony" since possession of any amount of cocaine is a felony under O.C.G.A. §16-13-30(a) (Doc. 45-9 at 3);

(c) "obstruction or hindering law enforcement" under "16-13-30(B)(M)," where the "M" presumably still means "misdemeanor" (Doc. 45-9 at 4); and

(d) giving a false name and date of birth to an officer under "16-10-25(M)," where the "M" again appears to signify "misdemeanor."

In the obstruction warrant, Snyder swore under oath that Coriell had "fled from a traffic stop after being told to place hands behind his back, [and] said accused continued to run after being told to stop," without any mention of assault, violence, or physical contact whatsoever.  (Doc. 45-9 at 4).  Because the warrant was the charging instrument, the facts alleged within the four corners of the warrant are what Coriell pled guilty to, which amounted to a misdemeanor because they did not allege any violence or threats.  He was only given a 12-month sentence on that charge (the same as on the other misdemeanor counts to which he pled guilty) – in stark contrast to the 3-year sentence on the felony drug charge.

Viewed in the light most favorable to Plaintiff, he pled to the acts charged in the warrant itself – not every hypothetical act that would fall under the obstruction statute, notwithstanding any typographical citation error on the warrant application which may have in turn been transposed onto the plea document. (Doc. 45-10).

7.    **There is evidence that Snyder followed defective policy which caused him to use excessive force.**    While Defendants contend that there is nothing wrong with their use of force and Taser policies as written, policy is not just what is on paper but what officers and their supervisors understand it to be in practice.  Viewing the testimony of Plaintiff's expert and the chief of police (who admits that the policy is whatever he says it is) in context with one another, reasonable jurors could conclude that the actual policy in practice that Chief Sparks testified to – and which he says that Officer Snyder followed – was defective because it enabled constitutional rights to be violated.  (Doc. 49 at 6, 11, 14-15, 21; Doc. 30 at 19-24; Doc. 34).  For reasons that will be discussed in the argument section on *Monell* liability, it is not necessary that a policy be unconstitutional on its face to impose municipal liability for actions caused by the policy – only that it be defective in a way that it causes a constitutional violation.

In summary, Appellant does not dispute that there was a reasonable basis to stop the vehicle for not having a tag, but that stop should have been terminated once the officer was satisfied by the driver's explanation.  There was no reasonable

basis to continue probing the passengers for possible outstanding warrants or possible crimes unrelated to the reason for the stop – which had the effect of entrapping Coriell into giving false information when there was no legal basis to continue questioning him at all – since he had engaged in no discernible activity that would arouse reasonable articulable suspicion of wrongdoing on his part.

While it was not unreasonable to pursue Coriell for running, it would have been just as reasonable not to do so given the minor nature of that offense and the fact that backup officers were en route to the scene. However, it was unreasonable that the incident escalated to that point in the first place due to the prolonged traffic stop. But irrespective of whether the stop was prolonged or not, Plaintiff's expert and Taser training make clear that it is unreasonable to tase someone who is merely fleeing and not actively fighting an officer. And even where Taser use might otherwise be appropriate, it unreasonable to tase someone running toward a hard surface where it is foreseeable that serious injury will result from the fall.

## Standard of Review

This Court reviews the decision to grant summary judgment de novo, applying the same legal standards which bound the district court. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

## SUMMARY OF ARGUMENT

Anthony Coriell was a backseat passenger who fled on foot from a traffic

stop, and who suffered skull fractures and a brain injury because he was shot in the back with a Taser[3] which caused him to fall face first on hard pavement. This is one of several recent cases in which this Court has been called upon to determine reasonableness of using a Taser to apprehend a nonviolent fleeing suspect in a location where it is foreseeable that serious injury will result.

It is axiomatic that deadly force cannot be used to stop a fleeing felony suspect who does not pose an imminent risk of death or serious bodily harm. *Tennessee v. Garner*, 471 U.S. 1 (1985). To the extent that a Taser is capable of causing death or serious bodily harm, it can be considered deadly force. *See Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479, n. 10 (11th Cir. 1985); *Eberhart v. State*, 307 Ga. 254, 835 SE2d 192 (2019). That is particularly true under circumstances where death or serious injury could foreseeably result from being tased, such as falling from a height or striking one's head on a hard surface. Appellant respectfully submits that the law is now clearly established that it is unreasonable to use a Taser to stop a nonviolent suspect from fleeing under circumstances where serious bodily harm is likely to occur, just as it would be

---

[3] As a stylistic matter, counsel uses the uppercase "T" because TASER® is a registered trademark that was hatched as an acronym for "Thomas A. Swift's Electric Rifle" from the Tom Swift series of science fiction books. Because the slang expression of "tasing" someone has come to apply generically to all forms of stun guns and electronic control weapons (ECW's), the verb form is not capitalized.

unreasonable to maim a fleeing suspect by shooting him in the leg with a firearm whether it results in death or not. Where the capacity to cause death or life-threatening injury outweighs any immediate risk posed by someone who is running but not fighting, there is a jury question under the Fourth Amendment as to the reasonableness of a given use of force that ultimately results in such injury.

The trial court seeks to draw a distinction between suspects who are fleeing and those who are "merely" fleeing. If such a line must be drawn, this case gives this Court an opportunity to do so for the sake of future cases given the apparent conflict between training standards enacted by Taser itself (which forbid the tasing of suspects who are fleeing but not combative) and the actual practice of some officers in the field. But even if such a line could be drawn, there would still be a question of fact as to whether that line was crossed. The evidence in this case can be interpreted both ways, which means that QI cannot be decided as a matter of law. Even if the clearly established rule is that suspects who are "merely fleeing" cannot be tased, the facts of this case - properly construed in favor of the plaintiff - could lead a jury to find that Coriell was not combative or threatening to assault anyone at the time he was tased, meaning he was "merely fleeing" even under the rule posited by the trial court.

The trial court failed to recognize a factual dispute on that issue, based not only on conflicts in testimony but also on review of the video evidence. The court

also failed to recognize the relevance of the fact that the traffic stop – though initially proper – was unreasonably prolonged, which is part of the totality of the circumstances under which the reasonableness of a Fourth Amendment seizure must be judged, including a seizure that culminates in the use of force. Under the totality of the circumstances, Officer Snyder violated the Fourth Amendment both by prolonging the traffic stop unreasonably and using unreasonable force, and the latter was a foreseeable consequence of the former as a matter of proximate cause, which is itself a jury question.

The trial court also downplayed the seriousness of Mr. Coriell's injury in balancing the threat posed by him against the foreseeability that tasing him would cause serious injury. The trial court merely noted that Coriell received facial lacerations and a crooked nose, when in fact he suffered skull fractures and a brain hemorrhage which required several days of hospitalization. Construing the facts relevant to both liability and damages in the light most favorable to the plaintiff, reasonable jurors could strike that balance differently and find that a constitutional line laid down by case law was crossed in this case.

Finally, the trial court misconstrued the meaning of "malice" in the context of official immunity for purposes of state law claims rather than simply dismissing those claims without prejudice for lack of jurisdiction, which would have been a more prudent course given the differences between state and federal and

considerations of federalism.

## ARGUMENT AND CITATION OF AUTHORITY

### A.    Reasonable jurors could find that it was objectively unreasonable under the Fourth Amendment to deploy a Taser against a passenger for merely fleeing the scene of a traffic stop

Under *Graham v. Connor*, 490 U.S. 386 (1989),

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)[4] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure")).    (emphasis added, internal citations and punctuation omitted).    In short, "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force.    *Harris v. Coweta County*, 433 F.3d 807, 818 (11th Cir. 2005), *overruled on other ground*s,

---

[4] *Garner* held that it was unreasonable to shoot an unarmed fleeing felony suspect solely to prevent his escape.    While a Taser may not be a deadly weapon *per se*, it is still capable of causing death or serious bodily harm – for instance, if someone is tased in the head or caused to fall on a hard surface as in this case.    **Accordingly, a TASER can be considered a deadly weapon in certain circumstances,** *Eberhart v. State*, 307 Ga. 254, 261, 835 S.E. 2d 192 (2019) (emphasis added), and each case must be decided on its own facts.    If it was unconstitutional to shoot and potentially kill the fleeing burglar in *Garner*, a jury could find it unconstitutional to tase and potentially kill a passenger in a traffic stop who flees on foot.

*Scott v. Harris*, 550 U.S. 327 (2007) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

Since *Graham* was decided more than three decades ago, the Eleventh Circuit has added the following factors to the non-exhaustive list to be considered in evaluating the totality of the circumstances surrounding a given use of force:

(1) the need for the application of force,

(2) the relationship between the need and amount of force used, and

(3) the extent of the injury inflicted.

284 F.3d at 1197-1198 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Weighing the above factors – severity of the crime versus severity of the injury, active resistance versus attempted flight, and immediacy of threat versus ease of later apprehension – in the light most favorable to Plaintiff as the nonmoving party, a jury could find that the "totality of the circumstances" did not justify the level of force used in this case. While it is also true that jurors could choose to accept Defendant's version of the facts and conclude otherwise, the Court cannot do that as a matter of law on summary judgment.

Even assuming for the sake of argument that Officer Snyder was entitled to qualified immunity, that would have no bearing on the City's *Monell* liability as long as the jury could find an underlying Fourth Amendment violation under a

proper view of the facts.  *See, generally, Owen v. City of Independence*, 445 U.S. 622 (1980) (qualified immunity not a defense for municipality); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (municipal liability can exist irrespective of whether officers are individually liable).  Because there is a *Monell* claim in the case, the Court is forced to address the issue of whether there is a Fourth Amendment violation.  The Court cannot sidestep that issue merely by ruling that the law is not clearly established, which would only bear upon the liability of Officer Snyder and not the liability of the City itself.[5]  (See the discussion of the two-pronged immunity analysis in the following section).

According to Plaintiff's expert William Harmening, the use of the Taser in this case was inconsistent with national training standards adopted by the professional law enforcement community.   (Doc. 30 at 20-24; see also Doc. 34).[6]

---

[5] While it might be possible in the abstract to rule that the law is unclear *and* no municipal policy (defective or otherwise) caused the officer to do whatever he did (constitutional or otherwise), it is difficult as a practical matter to imagine how a court could decide whether there is potential *Monell* liability without first deciding whether there is a potential constitutional violation.  Defining the parameters of the constitutional right in question would seem to be an essential prerequisite to assessing what customs, policies, or practices may have led to its being violated, since conceptually, it takes two points (a beginning and end) to draw a connecting line between cause and effect and determine whether that line is solid or broken.

[6] Plaintiff's expert submitted two Rule 26 reports:  his original report (Doc. 30), and an amended report which was updated to provide additional support for the *Monell* claim.  (Doc. 34).

Since 2011, all police training on the use of Taser devices has incorporated guidelines established jointly by the U.S. Dept. of Justice and the Police Executive Research Forum ("PERF"). Those guidelines include the following:

> Guideline no. 25: **ECWs should be used only against subjects who are exhibiting active aggression or who are actively resisting in a manner that, in the officer's judgement, is likely to result in injuries** to themselves or others. ECWs should not be used against a passive subject.

> Guideline no. 26: **Fleeing should not be the sole justification for using an ECW against a subject.** Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use an ECW on a fleeing subject.

(Doc. 30 at 19-20, quoting *Electronic Control Weapon Guidelines* (March 2011), a joint publication of the U.S. Department of Justice (COPS) and the Police Executive Research Forum; see also Doc. 34) (emphasis added).  None of the above guidelines were followed in this case.  (Doc. 30 at 22-24; Doc. 34).  While the violation of such guidelines is not in itself a constitutional violation, an officer's failure to follow the guidance they offer is relevant to show the unreasonableness of his conduct.  *Lombardo v. City of St. Louis,* 594 U.S. __, No. 20–391, slip op. at 4 (June 28, 2021) (*per curiam*).  And as will be discussed in the section below on *Monell* liability, such guidelines can also serve as a yardstick for judging the adequacy of the City's policies.

Reasonable jurors could find, from both expert testimony and video

evidence, that Mr. Coriell was merely "fleeing," which under national guidelines "should not be the sole justification for using an ECW against a subject." *Id.* at 8. In a similar case handled by Plaintiff's counsel, summary judgment was denied on the issue of whether the plaintiff was merely fleeing or physically resisting arrest:

> Next, a jury could reasonably find that Walker did not violently resist arrest. **While that point is hotly disputed, that is the point.** Based on Walker's and Dudley's testimony and the inconclusive video, the Court cannot say as a matter of law that Walker fought with Dudley as he fled.

*Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT), slip op. at 8 (M.D. Ga. 11/18/21) (emphasis added). The same is true here. Any view of the video which suggests that Coriell pushed Snyder in an assaultive manner is just as easily interpreted as Coriell pushing off to free himself from Snyder's grasp, and only a jury can resolve that uncertainty. And only a jury can make the credibility determination about Snyder's claim that Coriell somehow shoved Snyder's 300-pound frame out of his way, which reasonable jurors could find is not supported by either common sense or the video. In any event, Coriell's testimony that he merely ran is sufficient to create a factual dispute on that point; in fact, no variation of the words "push" or "shove" appear anywhere in his deposition in either questions or answers, as if they were an afterthought in preparation for Snyder's deposition, which was not taken until more than a month after Coriell was deposed.

In denying summary judgment in *Walker*, Judge Treadwell relied on a

published Eleventh Circuit decision finding a Fourth Amendment violation where

a motorist was tased on pavement while running from a traffic stop:

> Officer Benton argues that his use of force against Robinson was
> objectively reasonable and not excessive. Alternatively, he argues that
> the unlawfulness of his use of force was not clearly established at the
> time of the incident. We disagree.
>
> Officer Benton maintains that he fired his taser while Robinson was
> still on the ground. But the plaintiffs point to evidence in the record—
> eyewitness testimony contradicting Officer Benton and a taser
> cartridge's blast door on the far-side of the wall from where Officer
> Benton was standing—suggesting that Officer Benton fired his taser
> while Robinson was in a precarious position atop the eight-foot wall.
> On a motion for summary judgment, we resolve doubts about the
> record in favor of the non-moving party. So, for the purposes of our
> analysis, we assume that Officer Benton fired his taser while
> Robinson was atop the wall, temporarily paralyzing him and causing
> him to fall, break his neck, and die. We are tasked with deciding
> whether Officer Benton's use of force in this context—shooting a
> taser aimed at a person on top of an eight-foot wall who was unarmed
> and not suspected of committing any particular crime—was excessive.

*Bradley v. Benton*, 10 F. 4th 1232, 1240 (11th Circ. 2021) (internal citation and

subheading omitted).

Like this case, *Bradley* involved a passenger who inexplicably fled on foot

from a car stopped for a potential tag violation, but the Plaintiff in that case

challenged not only the reasonableness of the force but also the legality of the

traffic stop and foot pursuit themselves.[7]  Mr. Coriell does not dispute that there

---

[7] *Bradley* held that there was reasonable suspicion to make the stop and chase the
fleeing passenger.  However, the court did not address the *Rodriguez* issue about

was a reasonable basis for Officer Snyder to stop the vehicle, but asserts that the stop was unreasonably prolonged once Snyder made the decision not to charge the driver and told Coriell to step out of the car. (Doc. 30 at 15-18; Doc. 34 at 2-8). Had the stop been terminated once its purpose was completed, neither the flight nor use of force would have occurred.

On summary judgment, the unreasonably prolonged traffic stop is another part of the totality of the circumstances to be considered in assessing the reasonableness of the force used. A jury could find it was not only unreasonable to tase someone who was merely fleeing – and particularly one in a precarious position that would likely result in serious injury, but it was also unreasonable for for an officer to escalate the stop a way which was not only unconstitutional but would ultimately lead the same officer to use excessive force. *See, e.g., Jackson v. Sauls,* 206 F.3d 1156, 1167-69 (11th Cir. 2000) (unlawful stop could be proximate cause of subsequent police shooting that was independently justifiable otherwise).

The *Bradley* court also held that there was a factual dispute about whether the fleeing passenger was in a precarious position that could cause serious injury when the Taser caused him to fall. There was no video in that case, but there was

---

whether the stop was unreasonably prolonged, nor did it discuss the reasonableness of tasing someone who was merely fleeing irrespective of whether the fall would cause serious harm. Those questions were outside the scope of the appeal since the plaintiff had already prevailed in the trial court on the fall-from-height issue.

eyewitness testimony that he was on the wall and physical evidence found on the other side of the wall which authorized that inference. In this case, there is bodycam video which clearly shows that Coriell was about to cross from a grassy surface to a paved parking lot, where his forward momentum would clearly cause him to land when tased from behind.

In *Walker, supra,* the Middle District applied the published holding of *Bradley* by finding a materially similar constitutional violation where the Taser caused the fleeing suspect to fall forward onto pavement while running rather than from a height:

> Finally, a jury could find that a reasonable officer would have realized that tasing Walker while he was running could cause serious injury. **The difference between tasing a suspect who could fall from an elevated location and tasing a suspect running on a hard surface is only one of degree**. **In both situations, an uncontrolled fall can cause injury.**

*Walker*, slip op. at 8 (citing *Bradley*, 10 F. 4th at 1240) (emphasis added).

In support of Defendants' motion for summary judgment, Officer Snyder has provided a self-serving affidavit in which he states for the first time that he did not know Coriell was in a position where tasing him was likely to cause significant injury, although he does acknowledge he was aware that Coriell was approaching a paved shopping center parking lot. (Doc. 45-2 at ¶¶23-25). On the other hand, his deposition testimony suggests that it made no difference to Snyder whether Coriell

was in a precarious position or not:

> Q.   … [W]hen you tased him, how far away was he from the paved area where he landed?
> A.   I would have to go back and look at the video. I don't know. When I engaged the Taser, pressing the trigger, he was on grass.
> Q.   Were you conscious at all of whether the grass -- it was the edge of the grass adjacent to a parking lot, or do you just – I mean, were you -- were you -- were you focusing on the environment around here or are you basically just focusing on him?
> A.   I knew that he was on grass when I engaged the Taser.
> Q.   Okay.  You didn't notice whether there was pavement a foot or two past the grass?
> A.   I don't know what the distance was between where he was standing when I engaged the Taser and the pavement.
> Q.   Okay.  Did you -- in making the decision to deploy the Taser, did you in your mind make any evaluation about whether he would fall on grass or fall on something else?
> A.   From him running from a possible stolen vehicle, shoving me -- we'll use shoving because -- shoving – shoved[8] me out of the way and ran from a lawful traffic stop. I engaged -- I felt like – and running towards a busy shopping center.  **Unknown if there was any weapons involved or anything like that, I felt like I was justified in using that Taser in order to stop his flight.**

(Doc. 48 at 41-42) (emphasis added).

The significance of this testimony on summary judgment is fivefold:

1) It suggests that Snyder did not intend to hurt Coriell, although his subject

---

[8] The fact that he says "shoving" or "shoved" four times in one sentence suggests that he is either trying to convince himself that it happened that way – which he failed to mention even once in his police report and warrant affidavits prepared right after the incident – or that the shoving was so significant and worthy of emphasis that it is clearly visible on video, which it is not. The credibility of self-serving statements is a classic jury question, irrespective of how many times they are repeated.

intent is irrelevant for purposes of the unreasonableness standard of the Fourth Amendment;

2) Snyder was aware that Coriell was approaching pavement and declined to say how close it was, which is rebutted by Coriell's unequivocal testimony above that he was actually on the pavement when struck by the Taser darts (Doc. 44 at 46);

3) Snyder claims he did not know how close Coriell was to the pavement when he fired the taser, saying he would defer to the video, which is wide open to interpretation by the jury;

4) Snyder confirms that when he tased Coriell, he was only concerned about the mere fact that he was fleeing, with no concern about the proximity to the pavement and the risk of injury upon falling; and

5) Finally, Snyder's testimony admits he had no idea whether Coriell posed a continuing threat or not – which is tantamount to shooting someone who is running away from you because of the possibility that they might have a weapon which they might use against someone who might cross their path, which is hardly an imminent threat justifying force as a matter of law.

**B.    Officer Snyder is not entitled to qualified immunity because it is clearly established law in the Eleventh Circuit that it is unreasonable to tase a nonviolent suspect who is merely fleeing and likely to suffer serious injury.**

The doctrine of qualified immunity protects public officials from monetary

liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), cited in *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In determining whether an individual official is entitled to qualified immunity, there are two inquiries involved:

> (1)  The Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right; and

> (2)  The Court must determine whether the right allegedly violated was clearly established under the law which existed at the time of the alleged violation.

*Saucier v. Katz*, 533 U.S. 194 (2001) (directing courts to address those questions in sequential order), *as modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (allowing courts to address those questions in the order they see fit).  As stated in the previous section of this brief, the presence of a *Monell* claim in this case is a compelling reason to address the first prong first, because it is possible to have municipal liability (discussed in the next section) for a constitutional violation even if the individual Defendant has qualified immunity from personal liability

exposure.[9]  Secondly, it is not necessary (or practical, for the reasons stated in footnote 6) to consider the existence of a *Monell* custom, policy or practice if there is no constitutional violation in the first place.

Addressing the first prong of the qualified immunity analysis, there is clearly a jury question as to the existence of a Fourth Amendment violation based on the video and the testimony of Plaintiff's expert.  As for the second inquiry, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  All that is required is that "in the light of pre-existing law, the unlawfulness must be apparent." *Id.*   "[T]he salient question … is whether the state of the law [at the time of the alleged conduct] gave [officers] fair warning that their alleged [conduct] was unconstitutional."  *Hope*, 536 U.S. at 741.  One way to show 'fair warning' is by pointing to a prior case with similar facts, but that is not the only way to do so.  *Id; see also Taylor v. Riojas*, 141 S. Ct. 52 (2020) (reiterating *Hope*'s holding recognizing that a general constitutional rule may apply with "obvious clarity to the specific conduct in question," even though the challenged conduct has not previously been held unlawful).

---

[9] *See, generally, Owen v. City of Independence*, 445 U.S. 622 (1980) (qualified immunity not a defense for municipality); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (municipal liability can exist irrespective of whether officers are individually liable); *Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT) (M.D. Ga. 11/18/21) (qualified immunity not an issue when only the city is sued).

Under *Hope*, a factually identical precedent is not required if a "rule already identified by the decisional law" is articulated with sufficient clarity that it is not dependent on the peculiar facts of the case from which it arose. Such a rule can even be derived from dicta in view of *Hope*'s reliance upon "the reasoning, but not the holding," of prior litigated cases. 536 U.S. at 743. It is not necessary to show that "the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In other words,

> [I]f some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional without tying that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances."

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (citing *Hope*). For example, a holding such as *Bradley, supra* which prohibits tasing a suspect who risks serious injury falling from a height applies with equal clarity and force to a case such *Walker, supra* (or this one) where the suspect risks serious injury falling on a hard surface. "The difference between tasing a suspect who could fall from an elevated location and tasing a suspect running on a hard surface is only one of degree." *Walker*, slip op. at 8 (citing *Bradley*, 10 F. 4th at 1240). In other words, there is no material difference between the facts of *Bradley*, *Walker*, or this case –

which all involve fleeing suspects who were tased under circumstances where it was foreseeable that they would suffer injuries far more serious than any known threat they presented.

While qualified immunity was not at issue in *Walker* because only the municipality was sued, the court noted that the clearly established law against tasing suspects in precarious positions – such as the suspect who climbed the wall in *Bradley* – applied with equal clarity to suspects running on hard surfaces. "In both situations, an uncontrolled fall can cause injury." *Walker,* slip op. at 8.   The rule that emerges from both *Bradley* and *Walker*, based on the clearly established law cited within them, is that a reasonable officer would not tase a suspect who is merely running and could suffer injury from an uncontrolled fall.  That is a clearly understandable rule, and the question of whether a given fall would foreseeably cause injury is a question of fact as to whether the rule applies – not a component of the rule itself, which is clearcut and applicable to any number of fact patterns.

Appellees only cited one Taser case in the trial court to support their argument that the law is not clearly established:  *Draper v. Reynolds*, 369 F. 3d 1270, 1277 (11th Cir. 2004), which stands for the proposition that "a single use of the taser gun causing a one-time shocking cannot be considered a use of deadly force," but that case is readily distinguishable because the suspect in that case – unlike Mr. Coriell – was justifiably tased because he was "hostile, belligerent, and

uncooperative," and not merely fleeing.  Moreover, a "one-time shocking" of a combative suspect that does not cause serious injury would be excessive force if applied to a suspect such as Mr. Coriell who is nonviolent and merely running away, and it does rise to the level of deadly force where the tasing causes him to land on a hard surface and suffer a fractured skull and brain injury. *See, generally*, *Eberhart v. State*, 307 Ga. 254, 835 SE2d 192 (2019) (Taser can be deadly under certain circumstances).

The trial court declined to follow the reasoning of *Bradley* and *Walker* because neither case because had been decided at the time of the incident in this case, but that ignores the reality that the decisions in those cases were based on law that was already established before those cases were decided.  Unpublished decisions such as *Walker* are not binding in any event, but both *Bradley* and *Walker* found a jury question as to the existence of a constitutional violation under similar facts based on law that predated the conduct in both cases.   It is the authority cited *by* those cases – rather than the holdings of the cases themselves – which Appellant has cited to demonstrate the extent to which the law was already clearly established.

While qualified immunity was not at issue in *Walker* because the individual officer was not sued, it was an issue in *Bradley*, which held that the officer who tased a suspect who fell from a height was not entitled to qualified immunity when

clearly established principles of pre-existing law were applied to the previously unlitigated facts of that case. Relying upon decades of case law – from *Tennessee v. Garner* on down – articulating generally understood rules that apply to any number of fact patterns, this Court held in a published decision that "Officer Benton's decision to tase Robinson at an elevated height violated Robinson's clearly established right to be free from excessive force" for an incident that occurred in 2015,[10] four years prior to the incident in this case.  If the law was clearly established for Officer Benton in 2015 then it was also clearly established for Officer Snyder in 2019.  Officer Benton's decision to tase Robinson at an elevated height violated Robinson's clearly established right to be free from excessive force. *Bradley v. Benton*, 10 F. 4th 1232, 1236 (11th Cir. 2021).

The *Bradley* court began its qualified immunity analysis as follows:

First, there is a materially similar precedent: *Tennessee v. Garner* , 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). There, the Supreme Court held that a police officer used excessive force when he shot an unarmed burglary suspect to stop him from fleeing on foot. *See Garner* , 471 U.S. at 21, 105 S.Ct. 1694. The Supreme Court has cautioned us against relying on the holding of *Garner* to the extent that holding is "cast at a high level of generality." *Brosseau v. Haugen* , 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

---

[10] The undersigned counsel did not see the date of the *Bradley* incident anywhere in the Court of Appeals decision, but a docket search on the Court's website indicates that it occurred on August 6, 2015.  (Complaint, *Bradley v. Benton*, No. 1:18-cv-1518-CAP (N.D. Ga. 2018).  Given the *Bradley* court's reliance on cases decided as early as the 1980s, however, the date of the incident was clearly not a factor in its decision.

> **But we are concerned with *Garner*'s analogous facts, not *Garner*'s high-level holding. *Garner* clearly established that an officer cannot use deadly force to stop an unarmed man who is not suspected of committing a violent crime from fleeing on foot.** That is precisely what happened in *Garner* and that is precisely what happened in this case. Accordingly, *Garner* put Officer Benton on notice that he could not use deadly force to stop Robinson from running away on foot.

10 F. 4th at 1243 (emphasis added).

While not ignoring the differences in degree between a firearm and a Taser, the Court nonetheless held that those differences were not material from the standpoint of pointing an officer on notice of what the law requires when using a weapon that has the potential to cause death or serious injury:

> To be sure, there is one factual distinction between this case and *Garner*. In *Garner*, the officer shot the suspect with a gun. Here, Officer Benton shot Robinson with a taser. **But that is a distinction without a difference.** As explained above, taking the facts in the light most favorable to Robinson, Benton … used force that he knew would "create a substantial risk of causing death or serious bodily harm."

*Id.* (quoting *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479, n.10 (11th Cir. 1985) (emphasis added).

This case is clearly more on point with the facts of *Bradley* than the facts of *Bradley* were on point with *Garner* and other cases used to support this Court's denial of immunity in that case:

> **[T]he use of force here was obviously unconstitutional even absent a case directly on point.** Robinson posed no immediate threat to Officer Benton. He never tried to harm any of the officers, nor did he

make any threatening movements or gestures. The officers also had no reason to think he posed a threat to anyone in the apartment complex, which he had just left. He was not suspected of committing a crime involving the infliction of serious physical harm. He was not even the suspect of the traffic stop, which was conducted on the suspicion that Sims was driving with an illegal tag.

*Id.* at 1244. The only differences between this case and *Bradley* – that the suspect in one died while the other merely suffered a potentially life-threatening injury – are immaterial to the Fourth Amendment analysis, because the force used in both cases was foreseeably injurious and equally unjustified.  And if the law was clear at the time of the *Bradley* incident in 2015, it was just as clear when Mr. Coriell was injured in 2019.

Rather than relying on the robust consensus of authority recognized by this Court in *Bradley*, the trial court opted to follow an unpublished Southern District case which is neither binding authority nor clearly established law.  *Youngblood v. Williams*, No. 2:16-CV-118, 2017 WL 4819392, at *3-5 (S.D. Ga. Oct 25, 2017). While the facts of that case cannot be distinguished in a materially significant way, it is an outlier which has no precedential weight in this Court, which should follow the lead it previously set in *Bradley* when it held that the applicable law was clearly established at least four years before the date of this incident.[11]

---

[11] Nonetheless, *Youngblood*'s holding only professed to be applicable "under the circumstances of this case" (*id.* at 4).  Judge Wood's decision also makes no mention of any serious injuries, but it does make clear that the suspect in that case

**C.    Since the City admits the Taser was used in accordance with a policy that jurors could find defective, the City is subject to *Monell* liability**

As the Court knows, there is no *respondeat superior* liability under Section 1983, and the only way the City can be held liable under federal law is if Mr. Coriell's rights were violated because of a City policy.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978).  To establish municipal liability under *Monell*, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) a causal link between the policy or custom and an alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378 (1989).  It is not necessary that the policy or custom be unconstitutional on its face, only that it be the moving force behind the constitutional violation at issue. *Id.*  While a case can be made that the policy at issue in this case is constitutionally overbroad because it encourages the excessive use of Tasers, it is not necessary under *Harris* for Plaintiff to prove that the policy is unconstitutional *per se* – only that it caused Mr. Coriell's rights to be violated.  *Id.* at 385.

Most *Monell* claims fail because the plaintiff is either unable to prove the existence of a policy or a causal link between the purported policy and constitutional violation, since it is a high bar to infer policy and causation from conduct alone in the absence of a stated affirmative policy.  That is not a problem

---

had been told that he was under arrest and was thus actively resisting arrest, as opposed to simply fleeing and eluding an officer during a traffic stop.

in this case, because both the policy and adherence to it are admitted.

The City's police chief admits in his deposition that the City's policy allows use of a Taser against any fleeing suspect. (Doc. 49 at 6, 11, 14-15, 21).[12]   That statement of policy is inconsistent with nationally accepted law enforcement standards as well as Taser training and product, and there is expert testimony that such policy is defective. (Doc. 47-4 at 8-9).   As the City's chief of police, Sparks is an agent of the City and the one who sets departmental policy, so it is axiomatic that his admissions are imputable to the City.

If that were not enough, the officer who used the Taser has testified that he *understood* the department's policy to allow Taser use against any suspect who was fleeing, and he was acting pursuant to that policy when he tased Coriell:

> Q.  Does your Taser policy in your department, does it allow you to tase **somebody who is in flight if they're not presently being combative** or --
> A.  Yes, our department policy does.
> Q.  Okay.  **And so you were following that policy?**
> **A.  Yes.**

(Doc. 48 at 48) (emphasis added).  That is evidence – if not an outright admission – sufficient create a factual dispute on the *Monell* issue.  Because Chief Sparks (who admits that the department policy is whatever he says it is) has testified to the

---

[12] That purported policy must be accepted as fact on summary judgment because the chief confirms that he is "the final word on what the policy is" and whether Snyder's actions were in accordance with policy or not.  (Doc. 49 at 6, 15).

existence of a policy which both he and Officer Snyder admit was followed – combined with the expert testimony that the purported policy is defective because it causes constitutional rights to be violated – there is no material difference between this case and *Walker*, where the Middle District was constrained by the record to find a genuine issue of material fact under *Monell*. *Walker v. City of Sandersville*, No. 5:20-CV-438 (MTT) (M.D. Ga. 11/18/21).

If the chief's admitted policy and Snyder's understanding of it had been the only evidence of policy in the case, Plaintiff would be moving for partial summary judgment on that issue.  But because Defendants have pointed to written departmental policies that are not entirely consistent with the testimony about what the actual policy is and how it is carried out in practice, Plaintiff is not entitled to judgment as a matter of law because the testimony of Sparks and Snyder – while clearly enough to survive summary judgment and support a verdict in favor of *Monell* liability – is still subject to interpretation by the jury in the context of all the written and oral policy taken as a whole.  The jury could find that the chief's expression of policy and Snyder's adherence to it is the actual policy in practice, irrespective of what may be written down in a policy manual.  Alternatively, they could find that the written policy controls and that the chief and his subordinates merely failed to understand it, but that would still support Plaintiff's secondary *Monell* argument that the official Taser policy printed in the policy manual is still

defective as written, because there is expert testimony that "the Douglasville P.D.'s Taser policy is insufficiently written and fails to meet the accepted standards that are observed throughout the U.S."  (Doc. 47-4 at 8-9).

## D.    Reasonable jurors could also find that the unreasonable use of the Taser constituted a constitutional violation or tort under Georgia law

Aside from being a federal constitutional violation, the use of excessive force also amounts to battery under state law, and a seizure which is unreasonable under the Fourth Amendment should also be unreasonable under the analogous provision of the Georgia Constitution. O.C.G.A. §§51-1-13 and 51-1-14 (recognizing cause of action for battery); O.C.G.A. §16-3-21 (justification for self-defense); *City of East Point v. Smith*, 258 Ga. 111, 112, 365 S.E. 2d 432 (1998) (lawfulness of seizure under Georgia Constitution is analyzed under same reasonableness standard used for the Fourth Amendment).  The unreasonable use of force can also be characterized as negligence, although mere negligence is seldom actionable against an individual officer because Georgia law provides for official immunity for the negligent performance of discretionary acts, for reasons discussed in the next section.

Likewise, it follows that the same facts which create a genuine issue to be tried with respect to the Fourth Amendment excessive force claim also create a triable issue of fact under state law, both under the Georgia Constitution's

prohibition of unreasonable seizures (Art. 1, §1, ¶13) and under general principles of tort law such as battery and negligence. Georgia also has a separate constitutional provision which specifically provides that no person shall "be abused in being arrested…" GA. CONST. Art. 1, §1, ¶17.[13] For the same reason that Mr. Coriell's tort claims survive summary judgment, his state constitutional claims should as well. *See Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010).[14]

The analytical framework for state law excessive force claims – whether civil or criminal, constitutional or tort – is provided by the self-defense statute, O.C.G.A. §16-3-21, which states in pertinent part as follows:

> (a) A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is **necessary** to defend himself or herself or a third person against such other's imminent use of unlawful force; however, … a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is **necessary** to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

---

[13] Both provisions are in the Georgia Constitution's Bill of Rights, which is contained in Section 1 of Article I. The trial court order erroneously cites them as being part of Section 2.

[14] While there is no Georgia law equivalent of 42 U.S.C. §1983 expressly creating a private cause of action for state constitutional violations, O.C.G.A. §51-1-1 does create a cause of action in tort for the violation of any legal duty, public or private, and it goes without saying that the state constitution imposes legal duties upon public officers.

O.C.G.A. §16-3-21(a) (emphasis added).  A use of force that might be objectively reasonable under federal law might be deemed "necessary" under state law, so it is possible for the same jury to reach different outcomes on the same facts depending upon which body of law they are applying.

Like the federal Constitution, the Constitution of the State of Georgia contains a Bill of Rights which limits the power of law enforcement officers over individual citizens by enumerating certain rights which officers must respect in the performance of their duties.  (GA. CONST. Art. 1, §1). Simply stated, officers owe a duty to the public to obey the Georgia Constitution, and to refrain from violating it in their interactions with citizens.  But while Georgia has no equivalent of 42 U.S.C. §1983 which creates a private right of action for violations of the Constitution *per se*, its statutory tort law scheme expressly recognizes a private right of action for any breach of legal duty resulting in injury to a citizen.  Such a right of action has already been recognized by the Georgia Court of Appeals in the context of police shootings.  *Porter*, 303 Ga. App. 91, 692 S.E.2d 722.  *Porter* has also been cited by at least one federal court for the proposition that violations of the Georgia Constitution are actionable as torts:

> … Defendants point out that at least one panel of the Georgia Court of Appeals has cast doubt on whether a plaintiff may bring claims directly under the Georgia Constitution. *See Draper v. Reynolds*, 629 S.E.2d 476, 478 n.2 (Ga. Ct. App. 2006) (noting "that Georgia does not have an equivalent to 42 U.S.C. § 1983"). But another panel of the

> Georgia Court of Appeals declined to grant summary judgment on a plaintiff's claims under the Georgia Constitution. *Porter v. Massarelli*, 692 S.E.2d 722, 726–27 (Ga. Ct. App. 2010). The Court thus assumes for purposes of this motion that Plaintiffs may assert claims under the Georgia Constitution.

*Dyksma v. Pierson*, No. 4:17-cv-00041-CDL at *29, fn. 6 (M.D. Ga.  7/16/18),

*affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/19).

The notion that violation of a constitutional right gives rise to an action in tort is consistent with the principle, enshrined by the Legislature, that "[f]or every right there shall be a remedy; every court having jurisdiction of the one may, if necessary, frame the other."  O.C.G.A §9-2-3.  While it is an oft-stated platitude of federal law that the United States Constitution is not 'a font of tort law',15 our Legislature suggests that is not the case when it comes to the rights of citizens and duties of state actors under Georgia's Constitution. *Id.*  That concept is also embraced by our tort law, which expressly provides as follows:

> A tort is the unlawful violation of a private legal right other than a mere breach of contract, express or implied. A tort may also be the violation of a public duty if, as a result of the violation, some special damage accrues to the individual.

O.C.G.A. §51-1-1.  Accordingly, a tort is committed when either a legal right is violated or a legal duty is breached.  Furthermore,

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another,

---

15 *See, e.g., Paul v. Davis*, 424 U.S. 693, 700–01 (1976).

**although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby**.

O.C.G.A. §51-1-6 (emphasis added).

Because the foundational document of Georgia law – the Bill of Rights contained in the State Constitution – commands  officers of the state to refrain from unreasonable seizures (Art. 1, §1, ¶1) and abuse of suspects in the course of an arrest (Art. 1, §1, ¶17), the above code section explicitly recognizes a private right of action under which "the injured party may recover for the breach of such legal duty if he suffers damage thereby." By way of comparison, the language of 42 U.S.C. §1983, a state actor who subjects a party "to the deprivation of any rights, privileges, or immunities secured by the [federal] Constitution and laws" "shall be liable to the party injured in an action at law."  There is materially no difference between §51-1-6 (which explicitly creates a private right of action for damages caused by breach of a public duty) and Section 1983 (which explicitly provides a private right of action for damages caused by "the deprivation of any rights … secured by the Constitution").

Nothing in Georgia's tort law suggests that the breach of a constitutionally imposed duty is treated any differently than any other legal duty.  While the Constitution does confer immunity from tort liability upon public officials subject to certain exceptions, the same exceptions apply for state actors irrespective of

whether the duty in question is imposed constitutionally, statutorily, or by some other standard of care. Accordingly, a public duty may arise from a statute or constitutional provision, and the violation of that duty may give rise to a tort claim which is subject to all manner of tort defenses, including immunity.

For purposes of §§51-1-1 and 51-1-6, "[a] public duty is one owing to a general class of persons, regardless of any relationship that may exist between the actor and any class member." Adams & Adams, Ga. Law of Torts (1998 ed.), §1.2(b) (citing *Georgia R. & Banking Co. v. Sewell*, 57 Ga. App. 674(6), 196 S.E. 140 (1938)). O.C.G.A. §51-1-7 goes on to explain the circumstances under which breach of public duty becomes an actionable tort:

> Injury suffered in common with the community, though to a greater extent, will not give a right of action to an individual for the infraction of some public duty. In order for an individual to have such a right of action, there must be some special damage to him, in which the public has not participated.

O.C.G.A. §51-1-7.

O.C.G.A. §§51-1-6 and 51-1-7 are similar to Section 1983 in that they themselves are not sources of substantive rights, but merely authorize suit for violations of independent rights and duties enunciated elsewhere. Just as Section 1983 provides a mechanism for enforcing rights and privileges guaranteed by federal law, §§51-1-6 and 51-1-7 recognize that a claim for damages can be brought to enforce duties "found in another legislative enactment." *Walker v.*

*Oglethorpe Power Corp.*, 341 Ga. App. 647, ___, 802 S.E.2d 643, 656-57 (2017). By definition, the phrase 'legislative enactment' includes constitutional provisions as well as statutes.

While general statements of legal principle may not give rise to a cause of action unless they articulate a standard of care, the Georgia Bill of Rights' prohibition of unreasonable seizures (Art. 1, §1, ¶1) does impose a reasonableness standard which is specific enough to define the contours of a public duty enforceable in tort. *Compare Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 164, 744 S.E.2d 686, 688 (2013) (statute in question did not "articulate or imply a standard of conduct or care, ordinary or otherwise") (citing *Cruet v. Emory University*, 85 F. Supp. 2d 1353, 1355 (N.D. Ga. 2000) ("In order for a plaintiff to invoke O.C.G.A. §51-1-6, there must be the alleged breach of a legal duty with some ascertainable standard of conduct.").   That is consistent with the Legislature's pronouncement in O.C.G.A §9-2-3 that for every right, Georgia law provides a remedy, and the paramount source of legal rights is the Constitution. *See also Davis v. Standifer*, 275 Ga. App. 769, 772, fn. 2 (2005) (acknowledging that a constitutional violation may be a tort, in which case it is subject to the defense of official immunity discussed in the following section).

**E.    Snyder is not entitled to official immunity on the state law claims**

Unlike federal qualified immunity, which is based on clarity of the law,

Georgia's doctrine of official immunity protects individual officers from liability for negligence in the performance of discretionary functions.16  However, it does not apply to ministerial acts not involving the exercise of discretion, nor does it apply where the officer acts with "actual malice." *See, e.g., Merrow v. Hawkins*, 266 Ga. 390, 467 S.E. 2d 336 (1996)*; see also Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999). "[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act. 266 Ga. at 391, 467 S.E.2d 336. **Such act may be accomplished with or without ill will and whether or not injury was intended**…." 271 Ga. at 415, 520 S.E.2d at 898 (emphasis added).

In the context of whether official immunity applies to police use of force, the 'actual malice' standard has been articulated as acting with "actual intent to cause injury," irrespective whether the officer acted in good faith or bad in carrying out the intentional act.  *Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E. 2d 124 (1999).

> Thus, **if Appellees shot Gaddis intentionally and without justification, then they acted solely with the tortious "actual intent to cause injury.**" *See Gardner v. Rogers*, 224 Ga. App. 165, 169(4), 480 S.E.2d 217 (1996). On the other hand, **if Appellees shot Gaddis in self-defense, then they had no actual tortious intent to harm him, but acted only with the justifiable intent which**

---

16 Official immunity is a defense to state constitutional violations as well.  "[E]ven where the Plaintiff alleges a state constitutional violation, if the underlying conduct complained of is tortious and occurred within the scope of the state employee's official duties, the employee is protected by official immunity."  *Davis,* 275 Ga. at 772, fn. 2.

> **occurs in every case of self-defense**, which is to use such force as is reasonably believed to be necessary to prevent death or great bodily injury…

271 Ga. at 33, 518 S.E.2d at 125 (emphasis added).  It is the presence or absence of legal justification, not feelings of goodwill or spite, that determines whether an officer acts with intent to commit an act which is wrongful.

In short, if an officer uses reasonable and necessary force, he is not acting with actual malice and is entitled to official immunity, but if he uses more force than reasonably necessary, he is acting with actual malice and not entitled to official immunity. *See Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010) (no official immunity if jury finds that shooting of motorist was not reasonably necessary for self-defense). In short, it is an objective standard rather than a subjective one – which is underscored by the 'reasonably necessary' language used by the Supreme Court in *Kidd*.  Because the word 'malice' is deceptively anti-intuitive given its common usage in other contexts, it is understandable that some courts might misinterpret it. While the trial court has cited several lower court decisions which define actual malice is more subjective terms, but Appellant respectfully submits that those cases are wrongly decided to the extent that their language deviates from the words of the Georgia Supreme Court in *Kidd v. Coates*.

## CONCLUSION

For the reasons set forth in the foregoing argument of law and citation of authority, Appellant requests that the judgment of the trial court be reversed and the case be remanded for a jury trial.

Respectfully submitted this 25th day of August, 2023.

*/s/Craig T. Jones*
CRAIG T. JONES
Attorney for Appellant
Georgia Bar No. 399476

CRAIG T. JONES, P.C.
Post Office 129
Washington, Georgia 30673
(678) 643-0062
craigthomasjones@outlook.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Appellants complies with the 13,000-word limit set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by 11th Cir. Rule 32-4. From the caption reading "Statement Regarding Oral Argument" to the date in the signature block, this Brief contains exactly 12,998 words, including footnotes, according to Microsoft Word's word-count function, printed in Times New Roman 14-point typeface.

/s/ Craig T. Jones
Craig T. Jones
Ga. Bar No. 399476
Attorney for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I served the foregoing brief in opposition to summary judgment upon the following counsel via First Class U.S. Mail and the Court's electronic filing system:

Harvey S. Gray, Esq.
Alex Joseph, Esq.
Gray, Rust, St. Amand, Moffett & Brieske
950 East Paces Ferry Road NE, Suite 1700
Atlanta, Georgia 30326

Respectfully submitted this 25th day of August, 2023.

/s/ Craig T. Jones

_____

Craig T. Jones
Georgia Bar No. 399476
Counsel for Plaintiff

CRAIG T. JONES, P.C.
Post Office 129
Washington, Georgia 30673
(678) 643-0062
craigthomasjones@outlook.com